UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**ROBIN L. MORTON**,                                        Case No. 6:15-cv-00080-KI

                Plaintiff,                       OPINION AND ORDER

     v.

**COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION**,

               Defendant.


     Drew L. Johnson
     170 Valley River Dr.
     Eugene, OR 97401

     John E. Haapala, Jr.
     401 E. 10th Ave., Ste. 240
     Eugene, OR 97401

          Attorneys for Plaintiff

     Billy J. Williams
     Acting United States Attorney

Janice E. Hebert
Assistant United States Attorney
1000 S.W. Third Ave., Ste. 600
Portland, OR 97201-2902

Jeffrey E. Staples
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant


KING, Judge:

Plaintiff Robin Morton brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying Morton's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI"). I affirm the decision of the Commissioner.

## BACKGROUND

Morton protectively filed an application for DIB on July 12, 2010, and an application for

SSI on July 13, 2010, alleging disability beginning November 18, 2009. The applications were

denied initially and upon reconsideration. After a timely request for a hearing, Morton,

represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on

April 19, 2013.

On May 15, 2013, the ALJ issued a decision finding Morton was not disabled within the

meaning of the Act and therefore not entitled to benefits. This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on November 13, 2014.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are

denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

Morton met the insured status requirements through June 30, 2016. The ALJ noted Morton's earnings in 2009 and 2010 exceeded the presumptive level of substantial gainful activity ("SGA"), but she continued to address the remaining elements in the sequential review since the SGA evidence was not entirely clear. The ALJ identified Morton's severe impairments as: bipolar II disorder; post-traumatic stress disorder ("PTSD"); panic disorder without agoraphobia; cluster B personality traits; clinical bilateral thoracic outlet syndrome, right greater than left; clinical bilateral radial nerve peripheral neuropathy at the arcade of frohse, right greater than left; migraine headaches secondary to thoracic outlet syndrome; chronic musculoligamentous sprain of the cervical spine; chronic thoracic myofascitis; chronic musculoligamentous sprain of the lumbosacral spine; right wrist scapholunate ligamentous tear; urinary nocturia; urinary urgency; hypertonicity of the bladder; and dyspareunia. The ALJ found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

Given these impairments, the ALJ determined Morton could perform sedentary work with the following conditions:  Morton may sit or stand periodically to make a physical adjustment, with continuity of 30 minutes in position before adjustment; she can occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds; she can frequently stoop, kneel, crouch, and crawl; she can occasionally bilaterally push and pull; she can frequently bilaterally handle; she can perform simple, routine, and repetitive tasks; she should not perform fast-paced production work; her work must involve only simple, work-related decisions, with few, if any, work place changes; she can occasionally interact with the public, co-workers and supervisors; she will be off task less than ten percent of the day, outside of normal breaks, for restroom visits.

Given this residual functional capacity ("RFC"), the ALJ concluded Morton could not perform her past work.  She could, however, perform other work in the national economy, such as clerical checker, assembler of printed products, and addresser.

## FACTS

Morton was 29 years old on her alleged disability onset date, the date of an on-the-job injury at Petco Animal Supplies.  She does not have a high school diploma or GED certificate, but she worked at Petco for more than ten years.  During this time, she also worked shifts performing occasional work at a juice bar, as a waitress and bartender, and at a recreational center.

While at work on November 18, 2009, Morton injured herself on a ladder when it tipped forward while she was on it; she reported the ladder did not fall.  Tim Jones, P.A., examined her that very day and noted a contusion on her lower leg.  He approved her to return to work that day, but since she was five weeks pregnant he advised her to follow-up with her obstetrician.

Morton worked on November 19. She developed pain in her lower legs, right hand, right ribs, and back. Jeffrey Harris, M.D., examined Morton that day and diagnosed thoracic and lumbar strain, as well as contusion on her lower legs and right rib. The doctor prescribed Tylenol, physical therapy (if her obstetrician approved it) and returned her to modified work with limits on her overhead work and weight restrictions. Larry Brandis, M.D., of the same office, examined Morton again on November 23. She had miscarried the previous evening. Dr. Brandis prescribed Tramadol and Naproxen, and cleared her for work with just the weight limitations. He continued to clear her for modified work on November 30, December 7, and December 14. Morton attended physical therapy on November 30 and December 2, 2009.

For purposes of a workers' compensation claim, Jeffrey Colbert, M.D., examined and treated Morton on December 18, 2009. Morton reported injuring her right rib cage, her mid and low back; she felt no radicular pain, numbness, or tingling. X-rays of her chest were normal, as were x-rays of her thoracolumbar spine. Dr. Colbert continued her on modified work status, with no lifting greater than ten pounds, and no repetitive lifting. He prescribed physical therapy and Meloxicam. Morton reported improvement, but residual symptoms, on January 29, 2010. Dr. Colbert prescribed Medrol and returned her to modified work. Dr. Colbert gave her a cortisone injection on February 12, 2010 for tenderness over the parathoracic and paralumbar musculature on the right side, continued her work restrictions, and continued her Celebrex prescription.

On May 12, 2010, David Ramin, M.D., retroactively approved Morton's work release from February 10 to May 26, 2010, although she had been working during this time. The MRI of her thoracic spine on May 21, 2010 was normal.

Solomon Forouzesh, M.D., treated Morton on five occasions from June 2010 to September 2010. Dr. Forouzesh's September 8, 2010 opinion reported that Morton had fallen and dangled from a ladder, that she had a persistent muscle spasm in her back since that time, and that because she fractured her right ribs she had jaw and rib cage pain. As a result, he thought she had the following limitations: no repetitive movements; no lifting over ten pounds; no sitting in one position for more than 15 minutes or standing for more than an hour; avoiding pulling, pushing and crawling; and accommodating the need to stretch continuously to reduce muscle spasm.

Dr. Forouzesh separately opined that Morton would miss work three to four days a week due to headaches.

About nine months later, in June 2011, Morton sought treatment from Barbara Bryson, F.N.P., for digestive issues, anxiety, TMJ, back pain, and migraines. Morton's upper back muscles were somewhat tender, and her neck muscles were tight on the right posterior. Bryson thought many of Morton's physical problems were due to anxiety. Bryson prescribed Lexapro and lorazepam.

Morton underwent a mental health assessment in June 2011 before she began counseling. Hannah Beeching, MSW, and Ruthann Duncan, LMFT, reported Morton had last used methamphetamine in 2009, after being clean since 2003. Morton's appearance was unremarkable, her mood was unremarkable, she was cooperative, her affect was normal and congruent with mood, but she appeared restless. Thought process and content was also normal, and her cognition was normal. She reported mood swings, anxiousness, fear and hopelessness, but the counselors thought her prognosis was good.

Morton began attending counseling sessions with Bettina Jensen, LPC, beginning in July and continuing through March 2013. When asked by Morton's attorney to opine on any limitations, she referred him back to Morton and indicated she was unable to offer an opinion. Tr. 717.

Kay Dieter, M.D., examined Morton at the request of Disability Determination Services in June 2011. Morton reported using methamphetamine the previous year. Tr. 421. She also reported working at Petco in Albany. Somewhat inconsistently, Dr. Dieter then noted Morton had been working for Petco and was let go in January 2011. Dr. Dieter described Morton as pleasant and cooperative, dramatic, and somewhat histrionic. Dr. Dieter thought Morton's mental health impairments would be treatable with mood stabilizers. She thought Morton could handle simple and repetitive tasks. Her challenges would be interacting with coworkers, supervisors, and the public, as well as tolerating stress.

John Carr, M.D., examined Morton and completed a "medical/legal assessment" of her injuries. The doctor thought Morton had a "rather significant right thoracic outlet syndrome," which is a "common work place disorder[.]" Tr. 727. He thought Morton was a candidate for release surgery, he recommended an injection for her sciatic nerve, and he advised a specific kind of home exercise. Morton was not interested in Dr. Carr's treatment options.

At the request of Disability Determination services, DeWayde Perry, M.D., examined Morton in August 2011. Dr. Perry referenced the normal May 2010 MRI. Morton had an antalgic gait with decreased left lower extremity weight-bearing. She also had antalgic heel walking with decreased left lower extremity weight-bearing. She refused to tiptoe. Straight leg raising was normal sitting and supine. Morton was tender to palpation in the midline and right

and left paraspinal musculature of the cervical, thoracic, lumbar, and sacral spine. Dr. Perry diagnosed acute left ankle injury, for which Morton had an appointment already scheduled, and multilevel spinal arthralgia. He found Morton could stand and walk six hours, with unlimited ability to sit. She could lift and carry 20 pounds occasionally and 10 pounds frequently. She had no postural or manipulative limitations. Tr. 436.

Denise Routhier, M.D. examined Morton's foot and ankle pain in September. Morton was able to do aerobics for 30 minutes a day. Dr. Routhier diagnosed Morton with a sprain at the base of her fifth toe, causing pain in her ankle because Morton had altered her gait. The doctor recommended over-the-counter anti-inflammatory medication and commented on Morton's "pain somewhat out of proportion to exam findings and injury." Tr. 474.

Morton did not complain of back pain at her September 2011 appointment with Michelle Wyatt, M.D. She told Dr. Wyatt she had a history of crystal meth use "but none since January of this year." Tr. 552. She started Depakote. Dr. Wyatt described her as "quite pleasant and cooperative today and does not seem overly anxious or depressed." *Id.* Similarly, at her October appointment, Morton's mood was appropriate; Dr. Wyatt increased her Depakote dosage to help with anxiety.

When Morton's foot pain had not resolved, Dr. Routhier referred her for an EMG, which was normal. When Morton complained of shoulder pain and saw a specialist in Dr. Routhier's office, he commented that she complained of no tenderness along the dorsal spine, and no CVA tenderness. Otherwise, all of her tests were mildly positive.

Dr. Wyatt referred Morton to Edmond Whiteley, M.D., who performed a psychiatric evaluation in November 2011. He diagnosed Morton with depression and recommended continuing Lamictal.

Keely Petersen, PMHNP-BC, performed an initial psychiatric evaluation in June 2012. While Morton reported her mood as anxious, Petersen described her as relaxed with a neutral mood. She was somewhat circumstantial and evasive in her answers. Petersen diagosed PTSD, rule out bipolar, generalized anxiety disorder, and rule out body dysmorphic disorder. Petersen recommended counseling.

## DISCUSSION

Morton challenges two aspects of the ALJ's opinion: her treatment of Morton's symptom testimony, and her analysis of the opinion of treating doctor, Solomon Forouzesh, M.D.

I.    Morton's Credibility

Morton alleged disability from chronic anxiety, panic attacks, depression, migraines, temporomandibular joint disorder (TMJ), bipolar disorder, PTSD, migraines, and pain in her left foot, wrist, back, and neck. She reported feeling constant pain, which she treated with anti-inflammatory medications, ice, heat, and physical therapy. She said she argued with supervisors.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of

the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[1]

The ALJ gave numerous reasons for questioning Morton's testimony about the extent of her limited functionality. Morton does not challenge any of the following reasons: conservative treatment for her pain; failure to report wrist pain during the relevant period, and inconsistent statements that she enjoyed writing, designing clothing and painting; improved mood and anxiety when medicated, inconsistent with her report that her medications made her feel hostile with a need to go to the hospital; working after her onset date of disability; ceasing work for a reason other than her impairments; and inconsistent statements about her smoking and drinking activities. These are clear and convincing reasons supported by substantial evidence to question Morton's testimony about the severity of her symptoms. *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (reasons to question credibility include: inconsistent statements; less than

_____

[1]The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence. Def.'s Br. 2, n.1. The Ninth Circuit has rejected her argument. *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

candid testimony; unexplained or inadequately explained failure to seek treatment); *Parra*, 481 F.3d at 750-51 (evidence of conservative treatment, consisting of the use of over-the-counter pain medications, is sufficient to discount a claimant's testimony on the severity of an impairment).

In addition, the ALJ relied on Morton's daily activities. Morton disputes that her activities were inconsistent with her testimony about disabling symptoms, but the ALJ's interpretation of the evidence was rational. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (uphold ALJ's interpretation if rational); Tr. 433 ("a lot of cooking and cleaning"); Tr. 471 (camping as a hobby); Tr. 667 (care for niece and nephew); Tr. 689 (caring for five-year old child); Tr. 452 (exercised five to six times a week).

Morton also argues the ALJ misread a medical record which indicated Morton had not used methamphetamine in the past nine months to mean that was the last time Morton had taken the drug, when she says other records indicate the last time she used was in 2009. Tr. 22; Tr. 427. The ALJ's interpretation of the record is a fair one; Morton was repeatedly inconsistent about her substance abuse. *See* Tr. 421 (in June 2011 said last used methamphetamine the previous year); Tr. 427 (also June 2011, last used in 2009); Tr. 552 (September 2011 appointment, no use since January 2011); Tr. 542 (June 2012 appointment, last used ten years earlier).

Similarly, Morton disputes the ALJ's reading of the date Morton stopped working. Again, however, the ALJ's interpretation of the record is rational. Dr. Dieter, for example, indicated Morton was currently working at the Petco in Albany at the time of her examination in June 2011. Morton also testified that she lost her job in the end because she had to leave California and move to Oregon.

Finally, Morton argues the ALJ cherry-picked the medical record, rather than looking at the overall diagnostic picture. The ALJ's interpretation of the medical record is a rational one. Dr. Dieter opined Morton's mental health impairments were treatable and that she could perform simple work, so long as her interactions with others were limited. Morton's counselor, Jensen, declined to offer any opinion on Morton's functional limitations. Beeching thought Morton's prognosis was good. Dr. Whiteley described Morton as appropriate, relaxed and cooperative, with normal speech and thoughts, and diagnosed only depression. Dr. Petersen described Morton as relaxed with a neutral mood.

In sum, the ALJ did not err in her credibility analysis.

II.     Dr. Forouzesh's Opinion

Dr. Forouzesh, an internist and rheumatologist, examined Morton seven months after she was injured on the job. He saw her on five occasions from June 15, 2010 to September 29, 2010. He offered an opinion about her functional limitations.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at

1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial

evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066

n.2.

Because Dr. Forouzesh's opinion is contradicted by the opinions of Dr. Colbert, Dr.

Harris, Dr. Brandis, and Dr. Perry, the ALJ was required to give specific and legitimate reasons

for giving Dr. Forouzesh's opinion partial weight. The ALJ mentioned that Dr. Forouzesh only

treated Morton for a short time and that Morton's daily activities were inconsistent with the

opined limitations; further, Morton was able to work for eight months despite her migraines.

Morton asserts the ALJ also questioned Dr. Forouzesh's opinion because the doctor had

prescribed Ativan without the expertise to do so, and that the doctor's diagnoses of cervico-

lumbar sprain and aggravation of discogenic disease were not supported by the MRIs when there

is no evidence to suggest Dr. Forouzesh considered the MRIs.

Regardless of whether Dr. Forouzesh had the expertise to prescribe Ativan, the ALJ gave

other specific and legitimate reasons to question the doctor's opinion. First, regardless of

whether Dr. Forouzesh considered the imaging, his opinion was inconsistent with the objective

imaging which showed no abnormalities. Further, while Dr. Forouzesh's opinion lines up with

the opinions of Dr. Carr and Dr. Ramin, it is inconsistent with many other examining and treating

doctors, such as Dr. Colbert, Dr. Harris, Dr. Brandis and Dr. Perry. Finally, while Morton

suggests a different interpretation of the evidence about working despite her migraines, and the

extent of her daily activities, the ALJ's reading of the evidence is just as reasonable and is

consistent with the RFC. *Burch*, 400 F.3d at 679.

**CONCLUSION**

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.


IT IS SO ORDERED.

DATED this ___9th___ day of December, 2015.


            /s/ Garr M. King
           Garr M. King
           United States District Judge